In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1217

United States of America,

Plaintiff-Appellee,

v.

Kevin Wash, a/k/a KeKe,

Defendant-Appellant.


Appeal from the United States District Court
for the Northern District of Indiana, Hammond
Division.
No. 2:99-CR-46--Rudy Lozano, Judge.


Argued September 25, 2000--Decided November 2,
2000


  Before Flaum, Chief Judge, and Easterbrook
and Diane P. Wood, Circuit Judges.

  Flaum, Chief Judge.  Kevin Wash was
convicted of several counts related to
distributing cocaine base and carrying a
firearm during a drug trafficking
offense. Wash now appeals his conviction,
arguing that the district court erred in
admitting evidence of prior possessions
of crack cocaine under Fed.R.Evid.
404(b), in allowing his coconspirators to
testify about the identity of the drugs
that they dealt, and holding Wash
responsible for two ounces of crack
cocaine that an informant attempted to
buy from one of his coconspirators. For
the reasons stated herein, we affirm.

Background

  Wash was indicted on the following four
counts: (1) conspiracy to possess with
intent to distribute 50 grams or more of
cocaine base, in violation of 21 U.S.C.
sec. 846 from at least December of 1998
until approximately February 19, 1999;
(2) knowingly and intentionally
possessing with the intent to distribute
in excess of 5 grams of cocaine base, in

violation of 21 U.S.C. sec. 841(a)(1); (3) knowingly and intentionally attempting to possess in excess of 50 grams of cocaine base, in violation of 18 U.S.C. sec. 2; and (4) knowingly possessing a firearm during and in relation to a drug trafficking offense, in violation of 18 U.S.C. sec. 924(c). He pled not guilty to all four counts. Originally, the federal complaint was filed against Wash and his codefendants Trammell Washington, Consuela Jones, and Antonio Jones. Washington's trial was severed and he invoked his Fifth Amendment right when called as a witness by Wash. Both Consuela Jones and Antonio Jones pled guilty to Count 1 pursuant to a plea agreement and testified as government witnesses.

During December of 1998 until approximately mid to late February of 1999, Wash and Consuela Jones were involved in various drug transactions. Initially, Wash supplied Consuela Jones with crack cocaine from a house at 10th and Harrison Street in Gary, Indiana. When the supply dried up at this location, Wash began to purchase his crack through Consuela Jones at her apartment. Consuela Jones's cousin, Antonio Jones, supplied Wash with the crack. Wash's involvement in drug transactions also led him to assume a broker role in a drug deal with Trammell Washington. Unbeknownst to Wash, Washington was an informant for the police. Washington had been apprehended by the police after fleeing a residence in Gary, Indiana. There is some evidence that Wash was at the residence because his fingerprints were found at the scene. The residence had, among other things, crack cocaine, handguns, a revolver, a semi-automatic pistol, cellular phones, sandwich bags, beer bottles, and a razor blade. One of the cellular phones had Wash's nickname, KeKe, stored in the radio function of the phone.

The arrest of Washington impacted Wash because Washington made several telephone calls that were recorded in an effort to set up a controlled drug buy. Washington and FBI Agent Bradley Bookwalter placed a call to a pager number, put in the number "1600," which represented the price of two ounces of crack, and received a return call from Wash./1 Washington informed Wash that he needed to see him

about getting some drugs and asked Wash to put him in contact with Antonio Jones. This led to an exchange between Wash, Washington, and Consuela Jones. Wash called Consuela Jones to tell her that a friend wanted to get some crack cocaine from her cousin Antonio Jones. Consuela Jones proceeded to page her cousin and in the meantime Washington once again paged Wash. Wash called back Washington, told him that he contacted Consuela Jones, and that she was trying to get the crack cocaine from Antonio Jones. He then gave Washington Consuela Jones's phone number.

Several more exchanges took place, until finally an agreement was arrived at whereby Washington would call Consuela Jones and she would then page Antonio Jones when Washington called her back in ten minutes. The details at this point are a bit unclear, but it seems as though Antonio Jones was across the street from Consuela Jones's apartment and had planned to bring the drugs over upon Washington's arrival. Wash set up the deal and Consuela Jones acted as the intermediary between Washington and Antonio Jones. After calling Consuela Jones, Washington was given 1600 dollars, fitted with a transmitter, and transported to the area of Ms. Jones's apartment. Washington was accompanied by Gary Police Sergeant Reginald Harris in an undercover role while police officers acted in a surveillance capacity in the vicinity of Consuela Jones's residence at 1720 W. Fifth Avenue. The operation went awry when Sergeant Harris was recognized by a homicide suspect that the Sergeant had previously interviewed. In the meantime, a person fixing Consuela Jones's car also detected the police surveillance of her apartment and told her about their presence. Consuela Jones left her apartment with her children as Washington and Sergeant Harris approached.

Before trial, Wash filed a motion in limine to exclude from trial the introduction of prior bad acts evidence under Rule 404(b) and the introduction of testimony by his coconspirators concerning the identity of the drugs which they dealt. The district court denied Wash's 404(b) claim and allowed Consuela Jones and Antonio Jones to testify during trial regarding the

identity of the drugs they sold. Wash's initial trial resulted in a mistrial and his second trial ended in the jury finding him guilty on all counts. He was sentenced to a term of imprisonment of 240 months for Counts 1, 2, and 3 and a consecutive term of imprisonment of 60 months for Count 4.

Discussion

A.  404(b) Challenge

   Wash claims that the district court improperly admitted evidence of his prior bad acts under Fed.R.Evid. 404(b). The district court allowed the introduction of two prior occasions where Wash possessed crack cocaine. In 1996, police officers observed Wash and three other individuals apparently conducting drug sales with some motorists in Gary, Indiana. The officers confronted Wash and during a pat-down of Wash, he threw something on the ground. What he had thrown down was 23 packets containing a total of 3.5 grams of crack. On June 5, 1997, a search of Wash was conducted at the adult detention center in Minneapolis, Minnesota, which revealed 5.4 grams of crack cocaine hidden in Wash's anus.

   We review the district court's decision to admit evidence for an abuse of discretion. United States v. Curry, 79 F.3d 1489, 1494 (7th Cir. 1996). "Under Federal Rule of Evidence 404(b), evidence of other misconduct is not admissible to show that the defendant acted in conformity therewith, but may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, or identity." United States v. Wilson, 31 F.3d 510, 514 (7th Cir. 1994). A four-part test must be satisfied for evidence of prior acts to be admitted under Rule 404(b):

(1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed

by the danger of unfair prejudice. Id. at 514-15.

After considering, during a motion in limine, the defendant's and government's arguments concerning the prior bad acts evidence, the district court concluded that such evidence aided in proving Wash's knowledge of and/or intent to distribute crack cocaine. The prior bad acts, the district court found, were similar enough and close enough in time to be relevant and there was sufficient evidence to support a finding by the jury that Wash had committed the similar acts. Finally, the district court said "the probative value of the evidence is not outweighed by the prejudicial effect." As an additional precaution, the district court offered to provide a limiting instruction regarding the 404(b) evidence while it was being presented and during the final instructions to the jury.

The prior bad acts were admitted to prove Wash's intent to distribute crack cocaine under Count 2. "Possession of cocaine with intent to distribute under 21 U.S.C. sec. 841(a)(1) is a specific intent crime." United States v. Long, 86 F.3d 81, 84 (7th Cir. 1996). The evidence was introduced to prove Wash's intent and "[w]hen a defendant is charged with a specific intent crime, the government may present other acts evidence to prove intent." Id. at 84 (citations and internal quotation marks omitted).

Wash disagrees with the district court's determination that his prior acts were relevant to the current charges against him. According to Wash, the present case against him centers around his intent to distribute crack cocaine, which occurred in a crack house that had within it tele phones and firearms. In contrast, he argues his 1996 stop and frisk happened at a different location and with different people. The setting in the 1996 incident was also distinguishable in Wash's view because there was no completed transaction, Wash did not have a gun, no telephones were employed, nor was he inside a dwelling. Wash also contends that the 1997 Minnesota incident resulted from a search after Wash was under arrest. In addition, during the 1997 occurrence the drugs were found in Wash's anus, no one else was involved, and the search itself happened in

Minnesota and not in Indiana. Wash suggests that because the 1996 and 1997 incidents occurred at least 2 or 3 years prior to the conspiracy this makes them too remote in time to be relevant.

Wash's argument is not convincing. He focuses upon the factual differences between his two prior bad acts and his current convictions and this does not make for a strong case because "[s]imple differences in the type of conduct or charge at issue cannot defeat the similarity requirement. This prong of our Rule 404(b) analysis need not be unduly rigid." Long, 86 F.3d at 84 (citations and internal quotation marks omitted). Although Wash would like us to believe that there is no similarity between the 1996 and 1997 incidents and his current charges, all of these situations implicate him in possessing distribution amounts of drugs. The 1996 incident involved Wash throwing down 23 packets containing a total of 3.5 grams of crack cocaine. According to a government expert, a "dime bag" contains one-tenth of a gram of crack cocaine, which is sold for 10 dollars, and a typical user would only have 10 dollars to 30 dollars worth of crack cocaine at a time. Similarly, the government expert said that a person possessing an excess of 5 grams of crack cocaine typically would use this amount of crack for distribution and not personal use. The 1997 incident in Minne sota showed that Wash had 5.4 grams of crack cocaine. The 1996 and 1997 occurrences, like the current charges Wash faces, involved more than a small amount of crack cocaine--they involved distribution amounts. In United States v. Hernandez, 84 F.3d 931, 935 (7th Cir. 1996), we concluded that a prior marijuana conviction was similar enough to the charged crimes of distributing cocaine and heroin. What convinced the court that these prior acts were relevant was that although "[d]ifferent drugs were involved, . . . both incidents concerned distribution amounts of drugs and illicit transport." Id. at 935.

In this case, the common thread between the prior bad acts and the current charges is the distribution amounts involved and this unifying element overshadows any differences in location and the number of individuals involved. Furthermore, Wash's argument concerning

the time lapse between his 1996 and 1997 incidents and his current charges is not viable under this circuit's precedent. See, e.g., United States v. Kreiser, 15 F.3d 635, 640-41 (7th Cir. 1994) (seven years is close enough in time); United States v. Harrod, 856 F.2d 996, 1002 (7th Cir. 1988) (five year lapse in time is permissible); United States v. Tringali, 71 F.3d 1375, 1379 (7th Cir. 1995) (nine years is not too long). We therefore affirm the district court's decision to allow the prior bad acts evidence.

B.   Objections to Testimony Regarding the Use of the Term Crack Cocaine

   Wash further objects to the district court's decision to allow Consuela Jones and Antonio Jones to testify about the identity of controlled substances at trial. As part of a pre-trial motion in limine Wash objected to this type of testimony, but the district court decided not to render a decision on the question at that time. At trial, the district court allowed Consuela Jones and Antonio Jones to testify about what they believed was crack cocaine.

   We review a district court's decision to admit evidence for an abuse of discretion. United States v. Johnson, 137 F.3d 970, 974 (7th Cir. 1998). A determination made by a district court judge regarding the admissibility of evidence "'is treated with great deference because of the trial judge's first-hand exposure to the witnesses and the evidence as a whole, and because of his familiarity with the case and ability to gauge the likely impact of the evidence in the context to the entire proceeding.'" Id. at 974 (quoting United States v. Torres, 977 F.2d 321, 329 (7th Cir. 1992)).

   The record reveals that Wash's attorney objected several times to the testimony given by Consuela Jones and Antonio Jones when they used the term "crack cocaine." The basic premise of the objection was that "witness lay persons [were] testifying as to the chemical composition and the actual identity of something for which they are not competent to testify." Wash contends that neither Consuela Jones nor Antonio Jones were qualified as experts on the issue of controlled substances and therefore the testimony they presented was lay opinion. According

to Wash, lay opinion needs to be based upon first-hand knowledge and Rule 701 states that non-expert testimony is limited to opinions or inferences that are "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Fed.R.Evid. 701. According to Wash, Consuela Jones testified that she had never used crack and relied upon her customers' satisfaction to identify her product as crack. Likewise, Wash argues Antonio Jones premised his identification of his product as crack cocaine upon the fact that none of the people whom he supplied ever complained that it was not crack cocaine.

Wash's position is not persuasive. Consuela Jones and Antonio Jones "were no strangers to crack cocaine." United States v. Earnest, 185 F.3d 808, 812 (7th Cir. 1999). Consuela Jones testified that she had been dealing "dime bags" of crack cocaine for approximately two years. Creating these dime bags was not a haphazard affair, but rather involved a definite methodology. She would purchase 3.5 grams of crack for 100 dollars and break it down with a razor blade into twenty dime bags, which she sold for 10 dollars apiece. She used small ziplock bags to package the dime bags and when she ran out of these she would use small sandwich bags. According to Jones, she sold to crack addicts, her customers were satisfied with her product, and they returned for additional purchases. Antonio Jones also testified that for approximately two years he dealt in what he believed was crack cocaine, including sales to Consuela Jones and Wash, and had received no complaints. "[T]hose who smoke, buy, or sell this stuff are the real experts on what is crack." United States v. Bradley, 165 F.3d 594, 596 (7th Cir. 1999). Clearly, Consuela Jones and Antonio Jones were in the business of selling drugs. "[T]he people who transport, cook, cut up, bag, and sell crack are the sort of people who tend to know what crack is." United States v. Hardin, 209 F.3d 652, 661 (7th Cir. 2000). Wash additionally notes that Consuela Jones testified that she had never personally used crack cocaine; this is an empty argument since "a cashier at Jewel doesn't have to bite off a piece of the customer's broccoli to know which

vegetable she is ringing up." Id. at 661-62. Therefore, we affirm the district court's determination to allow Consuela Jones's and Antonio Jones's testimony.

C.  Sentencing Guidelines Challenge

Finally, Wash contends that the district court's inclusion of two ounces of crack cocaine in determining his offense level under the Sentencing Guidelines was clearly erroneous. We review a district court's conclusions with deference and "[t]he district court's determination of the quantity of drugs involved in an offense is a factual finding which must be supported by a preponderance of the evidence. This court must uphold such findings unless they are clearly erroneous." Tringali, 71 F.3d at 1381 (citations omitted). We will overturn a factual determination if we are left "with the definite and firm conviction that a mistake has been committed." United States v. Garcia, 69 F.3d 810, 819 (7th Cir. 1995) (citations and internal quotation marks omitted).

Wash argues that the attempted two ounce deal between himself, Washington, and Consuela Jones had no potential of being completed. Consuela Jones never received the two ounces nor did she know that the number "1600" was a code for two ounces, according to Wash. Furthermore, Consuela Jones testified that Washington would not deal with her cousin Antonio Jones and that she never had dealt in as large an amount as two ounces. Thus, Wash claims that there was a lack of intention to complete the drug deal and therefore the two ounces should not have been considered in calculating the quantity of drugs he was responsible for under the Sentencing Guidelines.

The Sentencing Guidelines are not silent with respect to Wash's contention. "Application note 12 to U.S.S.G. sec. 2D1.1 . . . indicates that negotiated quantities from an uncompleted drug transaction should be included for purposes of setting an offense level." United States v. Bonilla-Comacho, 121 F.3d 287, 291 (7th Cir. 1997). Nevertheless, if "the defendant establishes that he or she did not intend to provide, or was not reasonably capable of providing, the agreed-upon quantity of the controlled substance, the court shall exclude from the offense level

determination the amount of controlled substance that the defendant establishes that he or she did not intend to provide or was not reasonably capable of providing." U.S.S.G. sec. 2D1.1, comment. (n.12) (Nov. 1998). The burden is on the defendant to show that he did not have the intent or capability to provide the negotiated amount of drugs. Bonilla-Comacho, 121 F.3d at 292 n.2.

   The district court's determination that Wash was involved in setting up the attempted purchase of two ounces of crack cocaine with the informant Washington cannot be disturbed under our highly deferential standard of review. Washington had called Wash and expressed his desire to buy some crack. Wash then called Consuela Jones and informed her that he needed to acquire some crack for a friend. Consuela Jones in turn paged her source, that is, Antonio Jones. Wash called Washington and told him that he had spoken to Consuela Jones, that she was going to get the crack, and Wash provided Washington with Consuela Jones's telephone number. Washington indicated the amount of crack he desired by putting in the number "1600" in the pager calls that he made to Consuela Jones and Wash. Consuela Jones testified that she did not know what the number "1600" meant, but she did speak with Washington directly, and apparently they reached an understanding about delivering the drugs to Washington. This entire process appears to indicate that "negotiations and not idle talk" took place between the parties. Garcia, 69 F.3d at 820. Each person involved seemed intent about supplying the drugs and the discussions were not "mere puffery." Bonilla-Comacho, 121 F.3d at 292.

   Additionally, Wash did not hesitate to set up the deal and he had previously purchased two ounces of crack from Antonio Jones. Consuela Jones herself was no stranger to setting up drug deals as she had in the past arranged deals at her apartment between Wash and Antonio Jones. No one acted as if the deal would not proceed as planned. The deal was frustrated only by the discovery of the police outside Consuela Jones's apartment rather than by a decision of the parties themselves that the deal could not move forward. The district court upon allowing the two ounces to be considered said that

"the deal or the purchase of crack cocaine . . . had proceeded substantially and that the fact that the deal did not go through is not necessarily relevant in this case, due to the fact that there had been prior deals. And the evidence in this case showed that the drugs in question could have been supplied." The facts support the district court's reasoning. Wash has not provided us with any persuasive evidence that establishes that he lacked the intent or capability to go through with the deal and the burden to prove this is on him. The district court appropriately included the two ounces when it determined Wash's sentence. Therefore, we affirm the district court's decision to take into account the two ounces of crack cocaine.

Conclusion

   For the reasons stated herein, we AFFIRM the decision of the district court.

/1 According to the record, Agent Bookwalter could not recall if he or Washington placed the page.